# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

UNIVALOR TRUST, SA, et al.,                  :

      Plaintiffs,                         :

vs.                                          :        CA 15-0414-KD-C

COLUMBIA INTERNATIONAL,                      :
LLC, et al.,
                                             :
      Defendants.

## REPORT AND RECOMMENDATION

This cause is before the Magistrate Judge for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b), on plaintiffs' second amended complaint (Doc. 21), the defendants' various motions to dismiss (Docs. 32, 34-35 & 37; *see also* Docs. 33 & 36 (memorandum briefs)), plaintiffs' responses in opposition (Docs. 46 & 47), the defendants' consolidated reply (Doc. 51), and plaintiffs' motion to exclude (Doc. 52).[1] This cause came on for oral argument before the undersigned on November 24, 2015. Upon consideration of the foregoing pleadings, and the comments of counsel on November 24, 2015, the Magistrate Judge recommends that the Court **DENY** the defendants' motion to dismiss (Doc. 32, 34-35 & 37) for those reasons specifically identified during the hearing conducted on November 24, 2015, as properly understood within the context of this report and recommendation.

---

[1]     The undersigned has already partially ruled upon plaintiffs' motion to exclude (*see* Doc. 55) and now hereby **ORDERS** that the motion to exclude (Doc. 52) and motion for leave to file (Doc. 53) are **MOOT** based on the comments of the Court during the November 24, 2015 hearing.

## FINDINGS OF FACT

Plaintiffs initiated this declaratory action in this Court on August 13, 2015. (Doc. 1.) Because plaintiffs moved quickly to twice amend their complaint before the filing of any responsive pleading (*compare* Docs. 15 & 21 *with* Docket Sheet), the undersigned's sole focus will be on plaintiffs' second amended complaint (Doc. 21), the operative pleading in this matter. *Compare Rosa v. Florida Dep't of Corrections,* 522 Fed.Appx. 710, 714 (11th Cir. Jun. 26, 2013) ("Under the Federal Rules of Civil Procedure, 'an amended complaint supersedes the initial complaint and becomes the operative pleading in the case.'" (quoting *Krinsk v. SunTrust Banks, Inc.,* 654 F.3d 1194, 1202 (11th Cir. 2011)) *with DeSisto College, Inc. v. Line,* 888 F.2d 755, 757-758 (11th Cir. 1989) (acknowledging as proper the denial as moot of defendant's motion to dismiss the first amended complaint because the plaintiff filed a second amended complaint), *cert. denied,* 495 U.S. 952, 110 S.Ct. 2219, 109 L.Ed.2d 544 (1990).[2]

Plaintiffs seek a declaration from this Court that the named parties[3] (along with Rick Fletcher, Fletcher Petroleum and their related corporations) entered into a valid and binding settlement agreement in November of 2014—settling a dispute over loan monies originally made by Univalor to a member of defendant Columbia Petroleum, LLC in January of 2007—and that the defendants' "after-the-fact repudiation of the

---

[2]      While it is true that plaintiffs have again sought leave to amend their complaint a third time (Doc. 56), that motion makes no substantive changes to the complaint (*see id.,* Exhibit E). Indeed, the motion has been filed solely for purposes of attaching thereto the referenced Settlement Agreement. (*See* Doc. 56, at 1.) Inasmuch as the undersigned has considered the Settlement Agreement—it was attached to the defendants' consolidated reply after all—the undersigned need not await a ruling by the Court as to plaintiffs' request to amend before entry of this report and recommendation.

[3]      The named defendants in this action are Columbia Petroleum, LLC, Columbia International, LLC, Alabama Energy Holdings II, LLC, Benjamin Energy Holdings II, LLC, Occidental Energy Partners, Inc., and Chester F. English, III. (Doc. 21, at 1.)

settlement agreement is improper and invalid." (Doc. 21, at ¶¶ 34-47; *see also id.* at ¶¶ 13 & 33.)[4] During oral argument on November 24, 2015, the undersigned indicated that the facts underlying this action are not in real dispute and they are set forth hereinafter, beginning with the allegations of plaintiffs' second amended complaint.

      13.    In or around January 2007, Univalor made a loan to Livingston Investments II, LLC, a member of Columbia Petroleum, LLC, which loan was guaranteed by its members at the time, including English.

      14.    Non-party Parkland Energy Services, Inc. ("Parkland") entered into an acquisition agreement dated May 6, 201[0][5] with Columbia Petroleum, LLC for the acquisition of certain interests in oil and gas assets within the State of Alabama, which purchase price was to be paid by Parkland to Columbia Petroleum, LLC, which would be satisfied by the issuance of a $2,251,920.00 secured debenture to Forvest.

      15.    On September 16, 2010, Parkland executed a debenture certificate whereby it acknowledged itself indebted and promised to pay on September 16, 2012, the principal amount of $2,251,920.00 to Forvest.

      16.    Univalor was the registered and beneficial holder of the debenture certificate in the principal amount of $2,251,920.00 issued under the debenture dated September 16, 2010 between Parkland, as issuer, and Link Resource Partners, Inc., as trustee. Univalor later assigned its rights under the debenture to Forvest.

---

[4]    Although plaintiffs also insert in their action a request that "the Court order the Defendants to comply with the terms of the settlement agreement," (Doc. 21, at 11), the undersigned is unfamiliar with the ability of plaintiffs to seek to enforce a contract in a single-count declaratory judgment action under the Declaratory Judgment Act, *see* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."), without asserting an independent contract count. Therefore, at this point in time, the undersigned finds plaintiffs to be solely requesting the relief just referenced in the body of this opinion. However, plaintiffs are extended a period of time, up to and including **December 8, 2015**, to provide this Court with authority that through this single-count declaratory judgment action they can enforce the contract under the Declaratory Judgment Act without asserting a separate contract count.

[5]    The Settlement Agreement referenced herein makes clear that the acquisition agreement entered into by and between Parkland and Columbia Petroleum was entered into on May 6, **2010** (*see* Doc. 51, Exhibit 1, at 1), not May 6, **2012**, as mistakenly referenced in the complaint (Doc. 21, ¶ 14).

17.     As security for amounts due under the September 16, 2010 debenture[,] including the debenture certificate, Parkland granted a second lien mortgage, assignment of production security agreement, fixture filing and financing statement pursuant to which Parkland assigned to Link Resource Partners, Inc., as trustee, all of its right, title and interest in and to certain oil and gas interests located in the State of Alabama, said mortgage being subordinate to a mortgage granted in favor of nonparty Genesis Merchant Partners, LLP ("Genesis").

18.     Prior to the registration of the security interest of Parkland, certain Columbia Petroleum, LLC members, including English, by themselves or through corporations under their control, knowingly transferred interests to themselves that they knew were to form the security of the Parkland debenture, to the detriment of all of the security holders under the debenture, including Univalor.

19.     Following the closing of the agreement with Columbia Petroleum, LLC, and the delivery to Forvest of the debenture certificate and the debenture to the trustee, Link Resource Partners, Inc., $2,200,000.00 of the original $2,500,000.00 debt of Livingston Investments II, LLC, and its successor in interest Occidental Energy Partners, Inc., to Univalor was extinguished.

20.     Parkland failed to pay amounts due and owing under the debenture and the debenture certificate.

21.     Genesis foreclosed on the oil and gas interest[s] for a credit bid of $500,000.00.

22.     Rue Royal Minerals, LLC and Fletcher Petroleum Corp. subsequently acquired an interest in the oil and gas interests from Genesis and developed the same.

23.     The entity 2355254 Ontario Limited was the assignee of the second lien mortgage from Link and hence a junior creditor of Parkland. 2355254 Ontario Limited provided notice to Rue Royal and Genesis of its intention to redeem the Genesis Mortgage and take ownership of the oil and gas interests.

24.     In October, 2014, counsel for Defendants and counsel for Plaintiffs engaged in detailed settlement discussions with Rick Fletcher and Fletcher Petroleum and their related corporations, which were represented by attorney William T. McGowin, IV, and with Columbia Petroleum, LLC and English and their related entities, which were represented by John W. Sharbrough, III ("Sharbrough") with a view to

resolving Univalor's potential claims against them related to the ownership of various oil and gas interests.[6] Those settlement negotiations occurred between Plaintiffs' counsel, Judy Hamilton, who was located in Canada, and counsel for Defendants, who were located in Mobile County, Alabama.

25.    On or about October 29, 2014, Sharbrough confirmed that he had instructions to agree to the terms of the settlement agreement proposed by Univalor. Sharbrough confirmed, in writing, that his clients, including English, had accepted the terms of the settlement agreement.

26.    The agreed-upon settlement proceeds were to be paid of proceeds from Working Interest Points related to three wells located in Conecuh County, Alabama. The Working Interest Points were to be placed in a trust for Plaintiffs.

27.    Some of the oil and gas interests at issue were held by Benjamin Energy Holdings II, LLC, and controlled by English, who obligated the transfer of those interests via the settlement agreement.

28.    Sharbrough later confirmed that he was waiting for English to sign the settlement agreement on behalf of the other Defendants.

29.    On November 13, 2014, Sharbrough confirmed that English was going to sign the agreed-upon settlement agreement that day. Sharbrough confirmed that Defendant English understood that the settlement agreement needed to be signed that day and that he would let counsel for Plaintiffs know as soon as he received the signed agreement from Chester English.

30.    Counsel for English sent another correspondence to counsel for Plaintiffs later on November 14, 2014, confirming, "I have Chester's signature."

31.    After several weeks, counsel for Plaintiffs contacted Sharbrough about the signed settlement agreement. Sharbrough eventually informed Plaintiffs' counsel that, despite having received the signed agreement, his client had later decided against the agreement and that the signed agreement would not be provided to Plaintiffs' counsel.

32.    Rick Fletcher and Fletcher Petroleum executed the settlement agreement. Rick Fletcher and Fletcher Petroleum have thus far

---

[6]    "[I]n order to avoid the cost and uncertainty of future or further litigation, the parties hereto, without any admission of liability, desire to compromise and settle any and all claims arising from or appertaining to these transactions, including claims for contribution, in accordance with the following terms and conditions." (Doc. 51, Exhibit 1, at 3.)

complied with all [of] the terms of the settlement agreement they reached with Plaintiffs. Defendants, however, have refused to comply with the terms of the settlement agreement.

(Doc. 21, at ¶¶ 13-32 (footnotes added).)

The Settlement Agreement, referenced in the plaintiffs' complaint on numerous occasions, provides, in relevant part, as follows:

1.      The Fletcher/English entities shall pay the total sum of $2.5 million USD to Univalor (the "**Settlement Amount**"). The sum of 2.2 million USD is to be paid to Univalor within a sixty (60) month term which term shall commence as of September 1, 2014 and end on September 1, 2019, followed by additional two (2) cure periods of ninety (90) days and twenty-four (24) months respectively, as further described below in paragraph 5 (together with the 60 month term, the "**Payment Period**").

2.      The Settlement Amount shall be paid from the proceeds of the following Working Interest Points[7] which the Fletcher/English Entities shall put into a trust for Univalor (the "**Trust**") not to be released to the Fletcher/English Entities until the Settlement Amounts have been paid as set out in paragraph 5. The Working Interest Points which shall be placed in the Trust are as follows:

a.      Two (2) points in the Godwin 36-1 Well located in Conecuh county;

b.      Three (3) points in the Bradley 25-5 Well, located in Conecuh county;

c.      Three (3) points in the Benjamin 26-4 Well, located in Conecuh county; and

d.      Two (2) points in the Bradley 25-12 Well, located in Conecuh county. Collectively, the "**Trust Properties**".

---

[7]      "'**Working Interest Point**' or '**Point**' shall mean a one [] percent [1%] working interest in the Wells described in paragraph 2 hereof, subject to all applicable royalty payments to any Person at arm's length with the Settling Parties including overriding royalty interests which shall not exceed 25% of the total revenue of the well. The Working Interest Points shall also be subject to the applicable terms and conditions of Assignment and Conveyance dated October 22, 2013 by and between Genesis Energy Partners, LLC and Rue Royal Minerals, LLC, recorded in the Office of the Judge of Probate, Conecuh County, Alabama, at Deed Book 2013, Page 5546, including, but not limited[] to[,] the After Pay Out Working Interest (as defined in such Assignment and Conveyance) excepted and reserved by Genesis as set forth therein." (Doc. 51, Exhibit 1, at 5-6.)

3.     The Trust Properties shall be held by Trustees appointed by the Fletcher/English Entities pursuant to the Trust Declaration and Agreement appended to this Settlement Agreement as Schedule "B",[8] and the said Trustees shall have irrevocable payment instructions to disburse to Univalor or its assignee all amounts paid to the Trust in respect of the Trust Properties until the Settlement Amount has been paid in full to Univalor, at which time the interests may revert back to the Persons who placed the Trust Properties into the Trust. A copy of the Trust Certificate will be recorded in the office of the Probate Court for the county in which each Trust Property is located. The Fletcher/English Entities are to provide proof of the registration thereof within five (5) working days of the execution of the Settlement Agreement. The Fletcher/English Entities acknowledge and agree that they will adhere to and comply with the terms of the Trust including but not limited to the terms of this paragraph and paragraph 5 hereof.

4.     The Fletcher/English Entities will make available to Univalor all production information for the Trust Properties that the Fletcher/English Entities receive as and when the same is received until the Settlement Amount has been paid in full.

5.     The Trust shall pay Univalor the net income it receives arising from or out of the Trust Properties, until Univalor receives the total amount of $2.5 million USD. If, at the expiry of the sixty (60) month term, the Trust has not yet paid Univalor a total of $2.2 million USD, then the Fletcher/English Entities shall have an additional ninety (90) days (the "**first cure period**") to pay to Univalor the amount required to reach or make up any deficiency in the 2.2 Million USD required to be paid to Univalor. The Fletcher/English Entities shall have the right, during the cure period, to cure said shortfall in the payment to Univalor, but they shall not sell the Trust Properties without the express consent of Univalor, which consent will not be withheld if the net proceeds to Univalor will cure the deficiency.

---

[8]     Schedule B, the Univalor Settlement Trust, was an agreement putatively entered into effective as of September 1, 2014, by and between the Fletcher parties and the English parties, as grantors, and IBERIABANK, as trustee. (Doc. 51, Exhibit 2; *see also id.* at ¶ 15 ("The trust created by this instrument shall be known as the 'Univalor Settlement Trust.' Any property held by the Trustee may be held in, and any dealings by the Trustee may be carried on, under said name.").) "The Settlement Agreement Provides that Grantors *will create a trust and transfer the oil & gas working interests described herein to such trust,* the revenue from which will be used to satisfy the Grantors' obligations under the Settlement Agreement. Under the Settlement Agreement the Grantors have agreed to cause the Trustees to have $2,500,000.00 distributed to Univalor Trust SA (the 'Beneficiary')[.]" (*Id.* at 1 (emphasis supplied).) There is nothing indicating that Schedule B was executed by any of the parties thereto; that is, the agreement was not executed by any of the Fletcher parties, the English parties, or IBERIABANK. (*See id.* at 10-13.)

6.     The Working Interest Points listed in paragraph 2(d) (the "**Bradley 25-12 Points**") shall revert back to the original contributors upon receipt by Univalor of $2.2 million USD from the Univalor Trust. Following the first cure period, or upon the payment of the 2.2 Million USD, whichever comes first, the other Working Interest Points listed in paragraph 2(a), (b) and (c) shall remain in the Trust for up to an additional twenty-four (24) months, (the "**second cure period**") or until Univalor is paid the full Settlement Amount, whichever comes first. At the end of the second cure period, or when Univalor has been paid $2.5 Million USD in the aggregate from the Trust, the Trust will be dissolved and the Trust Properties will be distributed by the Trustees back to the original contributors.

(Doc. 51, Exhibit 1, at 6-8 (footnote omitted; footnotes added).)

As set forth in footnote 9, *supra*, there is no evidence that any of the "parties" to the Univalor Settlement Trust Agreement, i.e., Schedule B, actually executed that agreement. However, several relevant events occurred both before and after that unexecuted agreement was drafted and its putative effective date of September 1, 2014. By Assignment, Bill of Sale and Conveyance dated May 5, 2014, Rick Fletcher, in his capacity as Manager of Rue Royal Minerals, LLC, conveyed to Alabama Energy Holdings II, LLC, a 2.0% working interest in and to the Bradley 25-5 No. 1 well. (Doc. 51, Exhibit 3, at 13-14.) In December of 2014, Rick Fletcher, again in his capacity as Manager of Rue Royal Minerals, LLC, conveyed to Benjamin Energy Holdings II, LLC "a 2.0% working interest in and to the leasehold interest, well unit, and well bore covering the Benjamin 26-4 #1 Well," (*id.* at 35-36) and conveyed to Bradley Energy Holdings II, LLC "a 2.7% working interest in and to the Bradley 25-12 #1 Well[.]" (*Id.* at 45-46.) Thereafter, on December 18, 2014, Chester F. English, III, in his capacity of manager of each of Alabama Energy Holdings II, LLC, Benjamin Energy Holdings II, LLC, and Bradley Energy Holdings II, LLC, sought to assign to IBERIABANK, "**as trustee of the *Parkland Settlement Trust*,**" a certain percentage of the LLCs' interests in the just-referenced Bradley 25-5 #1 well ("a 1.25% working interest in and to the

leasehold interest, well unit, and well bore covering" the well), the Benjamin 26-4 #1 well (a "1.75% working interest in and to the leasehold interest, well unit, and well bore covering" the well), and the Bradley 25-12 #1 well (a "1.0% working interest"). (*See id.* at 50-52, 55-57 & 65-67 (some emphasis supplied).) These "assignments" were recorded in the Conecuh County Probate Court on December 23, 2014. (*See, e.g., id.* at 51, 55 & 66.) Not surprisingly, because there was no Parkland Settlement Trust at the time the foregoing assignments to IBERIABANK were filed, and IBERIABANK had taken no custody, possession or control of any of the property described in those assignments, Marianne W. Terry, as Senior Vice-President of IBERIABANK, quitclaimed all interest in those properties on February 15, 2015, and the cancellation of those assignments were recorded in the Conecuh County Probate Court on February 16, 2015. (*See id.* at 70-73, 75-77, 79, 80-81 & 83.) Thereafter, Alabama Energy Holdings II, LLC, Benjamin Energy Holdings, II, LLC, and Bradley Energy Holdings, II, LLC,[9] filed a quiet title action in the Circuit Court of Conecuh County, Alabama, on April 6, 2015, against defendants IBERIABANK, "A 1.25% working interest in and to the leasehold interest, well unit, and well bore covering the Bradley 25-5 #1 Well, . . . A 1.75% working interest in and to the leasehold interest, well unit and well bore covering the Benjamin 26-4 #1 Well, . . . [and] A 1.00% working interest in and to the leasehold interest, well unit and well bore covering the Bradley 25-12 #1 Well," in order "to remove a cloud that has arisen on title to the described working interest[.]" (*Id.* at 3 & 4.) The quiet title complaint reads, in relevant part, as follows:

> 15.    There is no assignee because there is no "Parkland Settlement Trust."

---

[9]    Bradley Energy Holdings, II, LLC is not a named defendant in the instant action. (*See* Doc. 21, at 1 (listing defendants).)

16.     The putative assignee, IBERIABANK, is not the Trustee of an entity known as the "Parkland Settlement Trust."

17.     The Plaintiffs are neither settlors [n]or makers of any trust and specifically not any entity known as the "Parkland Settlement Trust" nor parties to any settlement agreement.

18.     The purported assignments are not supported by any consideration.

19.     The purported assignments were never delivered to the nominal assignee, IBERIABANK as Trustee, or any other capacity.

20.     The Plaintiffs never intended to transfer or convey the Working Interest described herein to any trust, person or entity.

(*Id.* at 8.)[10] Again, not surprisingly, given the aforementioned cancellations and IBERIABANK's acknowledgement that there is no "Parkland Settlement Trust" of which it is a Trustee, plaintiffs and defendant IBERIABANK in the quiet title action entered into a joint stipulation to dismiss IBERIABANK with prejudice on May 20, 2015.

(Doc. 51, Exhibit 4, at 3-4.)

1.     This action has been filed by the Plaintiffs pursuant to the Code of Alabama, 1975, § 6-6-540, et seq., as a Complaint to Quiet Title on ownership of title to the described Working Interests described in the Complaint.

---

[10]     The only mention of Univalor and Forvest in the quiet title action is one which admits of what is true and that is that neither plaintiff was the intended beneficiary of a trust called the "Parkland Settlement Trust." (*See* Doc. 51, Exhibit 3, at 7 n.1 ("Two entities, Forvest Financial Services, Inc. (a Canadian corporation) and Univalor Trust, SA (a Swiss company) have written letters to Pruet Oil Company, 'laying claim' to the working interest as beneficiaries of an entity called the 'Univalor Settlement Trust.' (Not the 'Parkland Settlement Trust.') Neither is located in Alabama or within the personal jurisdiction of Alabama courts. Because only a Trustee has standing to assert a claim for trust property, neither entity has standing to assert a claim under the accidental filings. Additionally, neither party claims to be a beneficiary of a trust called the 'Parkland Settlement Trust' which was the trust named on the mistaken assignment[s].").)

2.     The parties stipulate and agree that IBERIABANK is not now and has never been the Trustee of an entity known as the "Parkland Settlement Trust". As such, IBERIABANK agrees that it has no interest in the ownership of the Working Interests in the three oil and gas wells located in Conecuh County, Alabama alleged in the Complaint.

3.     The undersigned parties further stipulate and agree that Paragraphs 12-14[11] of the Complaint to Quiet Title are true and correct and that any purported interests that IBERIABANK may have had as a purported Trustee of the Parkland Settlement Trust were cancelled as of Feb[ruary] 12, 2015 and have no effect to require the further participation of IBERIABANK as a Defendant in this case.

(*Id.*) And one day later, on May 21, 2015, Conecuh County Circuit Judge Jack B. Weaver entered an Amended Order of Dismissal, dismissing IBERIABANK with prejudice: "This cause having come before the Court without a hearing on the Joint Stipulation filed by the parties to dismiss IBERIABANK as a Defendant, and the Court having considered the Stipulation finds that the Joint Stipulation is well taken and is due to be and is hereby GRANTED by the Court. The Defendant, IBERIABANK, is dismissed as a Defendant, with prejudice, each party to bear its own costs. The entry of this Order does not act as a dismissal of any other Defendant." (Doc. 33, Exhibit B.)

On September 29, 2015, defendant Chester F. English, III filed a Rule 12(b)(1) and (6) motion to dismiss the second amended complaint (*compare* Doc. 32 *with* Doc. 33), in which the remaining defendants joined by separate motions to dismiss (*see* Docs. 34-37). The only "blip" in the joinder is with respect to defendant Columbia International, LLC, who separately argues that plaintiffs' complaint should be dismissed because it (Columbia International, LLC) was dissolved on June 19, 2007 (*see* Doc. 36, Attachment), and "[u]nder the applicable laws, a Limited Liability Corporation that was dissolved over 8 years ago and is no longer winding down its business and affairs is not a viable

---

[11]     These paragraphs merely set forth the February 12, 2015 cancellations (*see* Doc. 51, Exhibit 3, at 7-8), as described above.

legal entity that can be sued." (Doc. 36, at 2, generally citing Chapter 453 of MS SB 2310 for the proposition that "A dissolved limited partnership shall wind up its activities and affairs and, except as otherwise provided in Section 79-14-803, the partnership continues after dissolution only for the purpose of winding up."). Counsel then states "Columbia International LLC is no longer conducting any type of business." (*Id.*)

In their response in opposition, plaintiffs argue:

> Instead of a Rule 12(b)(6) inquiry, the proper mechanism to employ at this stage of the litigation is discovery, which will resolve the apparent conflict of Columbia's claim that it "is no longer conducting any type of business," [] with its negotiation and execution of the subject settlement agreement in 2014.

> Discovery will entail a review of the discharge of Columbia's liabilities as part of its winding down:

>> Upon dissolution of a limited liability company and until the filing of a certificate of cancellation as provided in Section 79-29-204, the persons winding up the limited liability company's affairs may, in the name of, and for and on behalf of, the limited liability company prosecute and defend suits, whether civil, criminal or administrative, gradually settle and close the limited liability company's business, dispose of any convey the limited liability company's property, <u>discharge the limited liability company's liabilities</u>, and distribute to the members any remaining assets of the limited liability company, all without affecting the liability of the members.

> <u>Miss</u>. <u>Code</u> <u>Ann</u>. § 79-29-803 (2007) (emphasis added). Discovery will clarify Columbia's role in the settlement process as they acted through their attorney, Sharbrough, to produce a bilateral settlement agreement and discharge its debt.

> Discovery will lead to the production of key documents, such as Columbia's Articles of Formation and Dissolution, and any records describing its debts and liabilities. Discovery would reveal whether Columbia had "a successor entity to which the remaining assets of the corporation [were] . . . transferred subject to its liabilities for purposes of liquidation," as described by <u>Miss</u>. <u>Code</u> <u>Ann</u>. § 79-4-14.03 (2007). Discovery could prove whether Columbia committed assets to satisfy the settlement agreement, and whether it then transferred any assets under the terms of the agreement in expectation of a release of claims. It would also show whether Columbia transferred assets in violation of the

agreement, as is described in its co-defendants' Consolidated Memorandum in Support of their Rule 12(b)(1) challenge, and to whom. Depositions of Columbia's member(s) who negotiated the agreement on its behalf would be necessary proof that it "is no longer conducting any type of business," despite evidence to the contrary.

Discovery would prove whether it is Columbia or its members that are the proper parties, which is now in question.

On the dissolution of any corporation, either by judgment or otherwise, all its real and personal estate shall be vested in the stockholders therein. . . . Debts due to and from the corporation shall not be extinguished by its dissolution, but debts due from the corporation shall be a charge upon its property.

Miss. Code Ann. § 79-1-17 (2007). If Columbia's claim is true, and it had stockholders who were vested with its property upon dissolution, the stockholders would be the real parties in interest. At this early stage of the litigation, there is simply no evidence in the record to substantiate Columbia's claim, and the allegations that are of record are in direct conflict with it.

(Doc. 47, at 5-7.)

Rather than waiting until the "Conclusions of Law" portion of this recommendation to rule on this argument by Columbia International, LLC, the undersigned notes, as set forth in more detail during the hearing on November 24, 2015, that the conclusion this defendant desires the Court to make at this time cannot be made as a matter of law based upon the Mississippi statutes cited. The motion to dismiss is premature in this regard, as even agreed by defendant's attorney during oral argument. Some discovery (that is, factual development) is needed with respect to this LLC's dissolution in 2007, its transfer of assets and payment of debt, etc. before a decision can be made that its putative participation in the settlement negotiations (through Charles English) has no import with respect to the resolution of this declaratory judgment action.

13

Turning to the defendants' primary brief in support of dismissal of the complaint, three bases for dismissal are set forth: "(a) on the face of the complaint it is clear that the requisite amount in controversy is lacking;[12] (b) the cause of action and the requested relief run afoul of the *Rooker-Feldman* Doctrine; and (c) the Plaintiffs' lack standing to bring the claim." (Doc. 33, at 2 (footnote added).)

> [A] careful reading of the Second Amended Complaint [] reveals no allegation that Univalor has been harmed or injured in any amount, much less $75,000.00.
>
>                       .       .       .
>
> At no point does the SAC allege that Univalor has suffered any legal or financial injury. It fails to allege monetary damages because, as far as these Plaintiffs are concerned, there are none. The Plaintiffs have no damages because as alleged, Fletcher Petroleum did execute the agreement, and is liable for the whole amount under the terms of the purported note. (SAC, ¶ 32). Thus, even if the Defendants were obligated to pay, which they are not, as long as Fletcher continues to comply and pay, then these Plaintiffs have no damages. Fletcher Petroleum could conceivably have a claim for contribution against the Defendants, but these Plaintiffs will never have one.[13]
>
>                       .       .       .
>
> Finally, the notion that the Defendants would enter into an agreement to pay more than $75,000.00 on a debt that is satisfied strains credulity to the point of being implausible.
>
>                       .       .       .

---

[12]   No one disputes that the Declaratory Judgment Act does not confer jurisdiction upon this Court, *see Stuart Weitzman, LLC v. Microcomputer Resources, Inc.*, 542 F.3d 859, 861-862 (11th Cir. 2008), or that, in this case, plaintiffs have specifically averred in the second amended complaint that this Court may exercise diversity jurisdiction.

[13]   Citing to a provision of the Settlement Agreement, along with ¶ 32 of the Second Amended Complaint, to similarly argue in reply: "When the fact that Fletcher is liable for the whole amount due under the 'settlement agreement,' is taken into consideration with the fact that Fletcher has executed the agreement and is in full compliance therewith, then it becomes abundantly clear that the Plaintiffs will suffer no economic loss as a consequence of the Defendants' failure to participate in the IberiaBank administered trust." (Doc. 51, at 5.)

Pursuant to the *Rooker-Feldman* Doctrine, this Court lacks subject matter jurisdiction to entertain a complaint that would in effect nullify a state court judgment. . . . [T]he plaintiffs fail to inform the Court that on May 21, 2015, the Circuit Court of Conecuh County, Alabama, entered its Order adopting a joint stipulation between Benjamin Energy Holdings II, LLC, Alabama Energy Holdings II, LLC, Bradley Energy Holdings II, LLC, and Iberiabank, as Trustee for the Parkland Settlement Trust, finding that Defendants Benjamin Energy and Alabama Energy were not settlors of the Parkland Settlement Trust and it quieted title in the Defendants' interest in the three (3) wells located in Conecuh County, Alabama in the name of Benjamin Energy, Alabama Energy and Bradley Energy. . . . Thus, any order of this court, granting the requested relief, and plac[ing] the Working Interest Points owned by the Defendants into the settlement trust would be a violation of the *Rooker-Feldman* Doctrine and beyond the court's subject matter jurisdiction.[14]

---

[14]     For the first time in reply, the defendants summarily argue that "Alabama Preclusion Law Mandates Dismissal[.]" (Doc. 51, at 17-18.) As stated during the November 24, 2015 hearing, this new argument by defendants is **REJECTED** inasmuch as a new basis for dismissal cannot be raised in a reply brief.

Returning to the defendants' *Rooker-Feldman* argument in favor of dismissal, the reply arguments in favor of application of that doctrine include the following:

**The Plaintiffs were present in the state court action because Iberiabank, the Trustee of the trust set up pursuant to the 'settlement agreement' which they ask the Court to validate and enforce in this case, was present.**

.     .     .

The presence of the Trustee, IberiaBank, in the state court action is the same as if the Plaintiffs, trust beneficiaries, were present. And as such, they are bound by the decision of the Circuit Court of Conecuh County. Because they are aggrieved by the state court order, they are state court losers.

.     .     .

The state court action quieted the title to the Defendants' interests in the Bradley 25-5, Benjamin 26-4, and the Bradley 25-12 wells located in Conecuh County, finding that the property was not properly part of any settlement trust.[]

Taking, therefore, the facts alleged in Plaintiffs' Second Amended Complaint . . ., in order to grant the relief requested by Plaintiffs, the Court will have to enter an order directing the Defendants to place in a trust the very properties that the Circuit Court of Conecuh County, Alabama has determined are not properly part of the settlement trust administered by the Plaintiffs' Trustee, IberiaBank. The Second Amended Complaint, while skillfully drafter to avoid insinuation of Rooker-Feldman in this case, seeks a *de facto* review of the state court judgment.

(Continued)

(Doc. 33, at 4-5, 5, 6, 7 & 8.)[15]

## CONCLUSIONS OF LAW

### A.    Motion to Dismiss Standard.

_____

.    .    .

The claims in this case are inextricably intertwined with the state court's finding that the same oil and gas properties which are the subject of this case, and owned by the Defendants in this case, are not part of the "settlement" trust for which Plaintiffs are beneficiaries. Nothing could be more intertwined.

.    .    .

The Plaintiffs are state court losers, because the decision in the state court action is contrary to the essential purpose of and relief sought in this case. In this case, the Plaintiffs seek an order directing the Defendants to transfer their working interests in three Conecuh County wells into the IberiaBank administered settlement trust, [] These are the same working interests, in the same wells, in the same settlement trust that were (sic) the subject of the state court action.

(*Id.* at 9, 11, 14-15, 15, 16, 16-17 & 17.)

[15]    The defendants also argue plaintiffs lack standing to bring their claim. (*See id.* at 8-10.) Indeed, this subsection is entitled: "**THE PLAINTIFFS LACK STANDING TO BRING THIS CLAIM BECAUE (1) ONLY THE TRUSTEE OF THE PURPORTED TRUST HAS STANDING AND (2) THEY HAVE SUFFERED NO LEGAL INJURY OR MONETARY LOSS**[.]" (*Id.* at 8.) Following this "heading," the defendants contend that "only the Trustee has standing to pursue claims against a settlor regarding the trust properties[,]" (*id.*), and that the plaintiffs are not real parties in interest (claiming that if anyone would be a proper plaintiff it would be the Fletcher parties), have no Article II standing, and they have presented no judiciable "case of actual controversy." (*See id.* at 9-10.)

And although the defendants' reply brief contains no similar arguments regarding the plaintiffs' purported lack of standing and the argument that plaintiffs set forth no judiciable case or controversy (*see* Doc. 51), the contention was made during oral argument that the plaintiffs' lack standing to bring this declaratory judgment action. As stated during the hearing on November 24, 2015, plaintiffs herein were parties to the settlement negotiations and the settlement agreement—IBERIABANK was not—and based on the contents of that settlement agreement and the comments of counsel and the Court during the hearing, the undersigned **FINDS**, and **RECOMMENDS** that the Court find, that the plaintiffs have standing to seek a "declaration of rights and obligations pursuant to a settlement agreement entered into among the parties." (Doc. 21, at 2.)

The defendants' motions to dismiss have been brought pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Docs. 32, 34-35 & 37.)[16] Since there is no "real" 12(b)(6) argument, the undersigned simply sets forth herein the appropriate standard of review under Rule 12(b)(1).

A motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction

> can be based upon either a facial or factual challenge to the complaint. If the challenge is facial, "the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised." [*Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981)]. Accordingly, the "court must consider the allegations in the plaintiff's complaint as true." *Id.*
>
> A "facial attack" on the complaint "require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). "'Factual attacks,' on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered.'" *Id.* Furthermore, in *Williamson*, the former Fifth Circuit held that "[t]he district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Williamson*, 645 F.2d at 413.

*McElmurray v. Consolidated Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007); *see also Andersen v. Omni Ins. Co.*, 2014 WL 838811, *1 (N.D. Ala. Mar. 4, 2014) ("Attacks on subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) come in two forms.

---

[16]     It was made clear during oral argument, however, that defendants are seeking dismissal solely for lack of jurisdiction in accordance with Rule 12(b)(1). There is simply no viable argument presented in the motions to dismiss that plaintiffs' complaint fails to state a claim for relief in accordance with Rule 12(b)(6). However, to the extent the motions can be read to contain a 12(b)(6) argument, that argument should be **DENIED**.

'Facial attacks' on the complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. 'Factual attacks,' on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered. These two forms of attack differ substantially. On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion— the court must consider the allegations of the complaint to be true. But when the attack is factual, the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." (internal emphasis, citations, brackets, and most quotation marks omitted)). The defendants insist that their jurisdictional argument is a factual attack (*see* Doc. 51, at 4), pointing out that "**IT IS NOT APPARENT FROM THE FACE OF THE COMPLAINT THAT MORE THAN $75,000.00 IS IN CONTROVERSY[]**" (Doc. 33, at 4),[17] and, additionally, asserting a *Rooker-Feldman*

---

[17]     The undersigned notes that, in *Lawrence v. Dunbar, supra*, the Eleventh Circuit held that "federal claims should not be dismissed on motion for lack of subject matter jurisdiction when that determination is intermeshed with the merits of the claim and when there is a dispute as to a material fact." 919 F.2d at 1531. That case involved a Rule 12(b)(1) motion to dismiss based on a "factual attack" on subject matter jurisdiction. *Id.* at 1529-1530. The district court dismissed the case for lack of subject matter jurisdiction after considering evidence and relying on the affidavit of a non-party to resolve a factual dispute between the parties as to whether one of the defendants, a federal employee, acted within the scope of his employment. *Id.* The Eleventh Circuit vacated the district court's opinion dismissing the case for lack of
(Continued)

argument, which obviously impacts subject matter jurisdiction, *see, e.g., Arthur v. JP Morgan Chase Bank, NA,* 569 Fed.Appx. 669, 674 (11th Cir. Jun. 13, 2014) ("The *Rooker-Feldman* doctrine 'is a jurisdictional rule that precludes the lower federal courts from reviewing state court judgments.'").

      **B.**    **The Amount in Controversy**.    As aforesaid, the parties agree that the Declaratory Judgment Act does not confer jurisdiction upon this Court, *see Stuart Weitzman, LLC, supra,* 542 F.3d at 861-862, and also that plaintiffs have specifically averred in the second amended complaint that this Court may exercise diversity jurisdiction (*see* Doc. 21, at ¶ 2).

      It is undisputed that federal courts may exercise diversity jurisdiction over all civil actions where the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states.   28 U.S.C. § 1332(a)(1).[18] "'The party invoking the court's jurisdiction bears the burden of proving, by a preponderance of the evidence, facts supporting the existence of federal jurisdiction.'" *Cincinnati Ins. Co. v. Emmons,* 2011 WL 1380023, *2 (S.D. Ala. Mar. 24, 2011) (quoting *QBE Ins. Corp. v. Dolphin Line, Inc.,* 2009 WL 3248016, *4 (S.D. Ala. Oct. 6, 2009), in turn quoting *McCormick v. Aderholt,* 293 F.3d 1254, 1257 (11th Cir. 2002)), *report and recommendation adopted,* 2011 WL 1380028 (S.D. Ala. Apr. 12, 2011); *see also Federated Mut. Ins. Co. v. McKinnon Motors, LLC,* 329 F.3d 805, 807 (11th Cir. 2003) ("'Federal courts are

---

subject matter jurisdiction because the district court applied the wrong legal standard. *Id.* at 1530. The Eleventh Circuit concluded that "[w]hen the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction." *Id.*, citing *Williamson v. Tucker*, 645 F.2d 404, 415-416 (5th Cir. 1981).

    [18]    Counsel agreed during oral argument that diversity of citizenship exists in this case.

courts of limited jurisdiction.' [] In order to invoke a federal court's diversity jurisdiction, a plaintiff must claim, among other things, that the amount in controversy exceeds $75,000."). Importantly, in the context of a claim for declaratory relief, as here, "the amount in controversy is the monetary value of the object of the litigation from the plaintiff[]s['] perspective." *Cohen v. Office Depot, Inc.,* 204 F.3d 1069, 1077 (11th Cir.), *cert. denied,* 531 U.S. 957, 121 S.Ct. 381, 148 L.Ed.2d 294 (2000). "A plaintiff satisfies the amount in controversy requirement by claiming a sufficient sum in good faith." *Federated Mut. Ins. Co., supra,* 329 F.3d at 807, citing *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938); *see also Canopius U.S. Ins., Inc. v. Prestige General Cleaning Services, Inc.,* 2014 WL 6979658, *2 (S.D. Fla. Dec. 9, 2014) ("'[Plaintiff need only] convince [the] Court that it is more likely than not that the pleading satisfies the jurisdictional minimum.'").

Here, the plaintiffs specifically aver that "the matter in controversy exceeds $75,000.00, exclusive of interest and costs," (Doc. 21, at ¶ 2), and then go on to connect that jurisdictional assertion with factual allegations concerning the injury to plaintiffs caused by the defendants' failure to abide by the terms of the Settlement Agreement (*see id.* at ¶¶ 13-33). Facially, therefore, as stated during the hearing on November 24, 2015, the complaint allegations are sufficient to allege the requisite amount in controversy, *cf. Rance, infra,* 316 Fed.Appx. at 863, particularly given that the amount in controversy is the monetary value of the object of the litigation from the plaintiffs' perspective. And while defendants contend that their challenge to the amount in controversy is a factual attack nowhere do they point to any "outside" evidence establishing that the amount in controversy necessarily is less than $75,000.00, or otherwise undermining the plaintiffs' good faith assessment of the value of their claim; indeed, the only arguable "outside" evidence to which reference is made is the Settlement Agreement and that document

indisputably establishes that the amount in controversy exceeds $75,000, exclusive of interest and costs. Therefore, in truth, the defendants' attack is not a "factual one," *see Dibble v. Avrich,* 2014 WL 6632629, *5 (S.D. Fla. Nov. 21, 2014) ("[D]espite raising the specter of an evidentiary challenge, Defendants have submitted no evidence whatsoever—as to the amount-in-controversy or otherwise. Therefore, the Motion cannot be construed as a factual attack on this Court's jurisdiction by recourse to information outside the pleadings." (footnote omitted)).[19]

**C.** **The *Rooker-Feldman* Doctrine**.   "The *Rooker-Feldman* doctrine 'is a jurisdictional rule that precludes the lower federal courts from reviewing state court *judgments*.'" *Arthur v. JP Morgan Chase Bank, NA,* 569 Fed.Appx. 669, 674 (11th Cir. Jun. 13, 2014) (emphasis supplied), quoting *Alvarez v. Attorney General for Florida,* 679 F.3d 1257, 1262 (11th Cir. 2012). The Supreme Court, in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005), defined and confined the reach of this doctrine: "The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* at 284, 125 S.Ct. at 1521-1522. Following the Supreme Court's decision in *Exxon Mobile,* the Eleventh Circuit specifically determined that "[t]he *Rooker-Feldman* doctrine now applies when '(1) the success of the federal claim would "effectively nullify" the state court judgment, or . . . (2) the federal claim would succeed

---

[19]      Even if the defendants' attack could be coined "factual," dismissal would not be appropriate inasmuch as it is clear in the Eleventh Circuit that "[i]n a factual challenge, the district court must provide the plaintiff with an opportunity for discovery and for a hearing that 'is appropriate to the nature of the motion to dismiss.'" *Rance v. D.R. Horton, Inc.,* 316 Fed.Appx. 860, 862 (11th Cir. Aug. 21, 2008), quoting *Williamson v. Tucker,* 645 F.2d 404, 414 (5th Cir. 1981).

"only to the extent that the state court wrongly decided the issues."'" *Arthur, supra,* 569 Fed.Appx. at 675, quoting *Alvarez, supra,* 679 F.3d at 1262-1263, in turn quoting *Casale v. Tillman,* 558 F.3d 1258, 1260 (11th Cir. 2009) (per curiam).

The undersigned simply is unable to discern a pertinent state court "judgment" rendering plaintiffs losers which this Court is being asked to reconsider and reject in the instant declaratory judgment action. Defendants herein point not to a judgment but, instead, an amended order of Conecuh County Circuit Judge Jack B. Weaver granting the joint stipulation entered into by and between plaintiffs Alabama Energy Holdings II, LLC, Benjamin Energy Holding II, LLC and Bradley Energy Holdings II, LLC and defendant IBERIABANK, and dismissing IBERIABANK with prejudice. (Doc. 33, Exhibit B.) The order made clear that it did "not act as a dismissal of any other Defendant." (*Id*.)  The order makes no mention of "quieting" title with respect to the working interest the defendants' claim are inherently the "same" both before this Court and the Circuit Court of Conecuh County, Alabama. (*See id.*) Even looking at the joint stipulation referenced by the order, it is apparent that IBERIABANK was due to be dismissed because it was not the Trustee of the "Parkland Settlement Trust" because no such trust existed and it was because of this fact (that is, the fact that IBERIABANK had never been Trustee of an entity purportedly known as "Parkland Settlement Trust") that IBERIABANK agreed it had "no interest in the ownership of the Working Interests in the three oil and gas wells located in Conecuh County, Alabama alleged in the complaint." (Doc. 33, Exhibit A, at 1-2.) Neither Judge Weaver's order dismissing IBERIBANK with prejudice or the joint stipulation of dismissal purport to suggest that IBERIABANK agreed that "the property (that is, the working interests) was not properly part of *any settlement trust*." (Doc. 51, at 15.) Nor is there anything to suggest, as argued by the defendants, that "[t]**he Plaintiffs were present in the state court**

action because Iberiabank, the Trustee of the trust set up pursuant to the 'settlement agreement' which they ask the Court to validate and enforce in this case,[20] was present." (*Id.* at 9 (footnote added).) That plaintiffs were not present in the Conecuh County Circuit Court and that IBERIABANK did not "throw the baby out with the bath water" is evident from the import of the joint stipulation of dismissal which is based upon the fact that IBERIABANK was not Trustee of an entity known as the "Parkland Settlement Trust" and because it was not Trustee of such entity (and only because of that fact) it disclaimed any "interest in the ownership of the Working Interests in the three oil and gas wells located in Conecuh County, Alabama alleged in the Complaint." (Doc. 33, Exhibit A, ¶2.) The Settlement Agreement in this case, of course, references the "Univalor Settlement Trust" and because the state-court case makes no reference to that trust, not only were plaintiffs decidedly not present in the state-court proceeding[21] but, as well, there has been no showing that IBERIABANK knew that it was Trustee of the "Univalor Settlement Trust" and was also in that capacity disclaiming any interest in the ownership of the Working Interests in the Bradley 25-5 #1 Well, the Benjamin 26-4 #1 Well, or the Bradley 25-12 #1 Well.

## CONCLUSION

Based upon the foregoing, and all arguments contained in plaintiffs' briefs in opposition to the motions to dismiss (*see* Docs. 46 & 47), the Magistrate Judge

---

[20]    Defendants are utterly "wrong" in this assertion because IBERIABANK was not before the Circuit Court of Conecuh County, Alabama as Trustee of the Univalor Settlement Trust.

[21]    Indeed, the state-court complaint makes clear that the plaintiffs in this action were not proper parties to the state-court action inasmuch as that complaint makes clear that neither Univalor nor Forvest "claims to be a beneficiary of a trust called the 'Parkland Settlement Trust' which was the trust named on the mistaken assignments." (Doc. 51, Exhibit 3, at 7 n.1.)

recommends that the Court **DENY** the motions to dismiss filed by the defendants (Docs. 32, 34-35 & 37).

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D.ALA. L.R. 72.4. The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 25th day of November, 2015.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**